**In re METRO WATER AND COFFEE SERVICES, INC. f/k/a Metro Food & Vending Service, Inc., Debtor.**

**METRO WATER AND COFFEE SERVICES, INC., Plaintiff,**

**v.**

**ROCHESTER COMMUNITY BASEBALL, INC., Defendant.**

**Bankruptcy No. 93–20608. Adv. No. 93–2065.**

United States Bankruptcy Court, W.D. New York.

Aug. 26, 1993.

David D. MacKnight, Lacy, Katzen, Ryen & Mittleman, Rochester, NY, for plaintiff.

Larry D. Scheafer, Harter, Secrest & Emery, Rochester, NY, for defendant.

## BACKGROUND

JOHN C. NINFO, II, Bankruptcy Judge.

On March 19, 1993, the Debtor, Metro Water & Coffee Services, Inc. (the "Debtor"), a food service business, filed a petition initiating a Chapter 11 case. In its

schedules, the Debtor listed Rochester Community Baseball, Inc. ("RCB") as having an unsecured disputed claim in the amount of $59,905.78. In its statement of affairs, the Debtor indicated that on November 24, 1992 RCB terminated a Concession Agreement (the "Concession Agreement") with the Debtor and thereafter seized certain equipment owned by the Debtor in which it held a security interest.

On March 23, 1993, four days after it filed its petition, the Debtor commenced an adversary proceeding against RCB alleging that the November 24, 1992 termination of the Concession Agreement was constructively and intentionally fraudulent within the meaning of Section 548(a) of the Bankruptcy Code [1] and Section 276 of the New York Debtor and Creditor Law.[2]

On April 14, 1987, RCB, the owner of a Triple A baseball team in Rochester, New York, entered into the Concession Agreement with the Debtor. It granted the Debtor, under the terms and conditions set forth in the Agreement, the exclusive right to sell certain products at Silver Stadium where the baseball team plays and other public events are held. The term of the Concession Agreement was from April 14, 1987 through October 31, 1996, unless terminated earlier pursuant to the terms of the Agreement.

As security for the payment of all amounts due or to become due to RCB under the Concession Agreement, including the payment of concession fees, the Debtor granted RCB a security interest in certain equipment used by Debtor at Silver Stadium, which security interest RCB subordinated to the security interest of the Debtor's primary lender, Chemical Bank.

By letter dated August 3, 1992, RCB, by its counsel, in accordance with the provisions of the Concession Agreement, notified the Debtor of a default in the payment of the concession fees required to be paid by Section 5 of the Agreement and demanded that they be paid. The notice of default also indicated that without waiving its rights under the Concession Agreement regarding the existing default, RCB would be willing to attempt to continue to work out a resolution of these matters with the Debtor. Thereafter, pursuant to Section 13 of the Concession Agreement, by letter dated November 24, 1992, RCB terminated the Agreement. In its notice of termination, RCB listed two principal reasons for the termination: (1) despite the August notice and attempts to work out the Debtor's defaults, the Debtor had failed to pay the concession fees then due under the Concession Agreement in the amount of $59,905.78; and (2) the Debtor had failed to pay its suppliers promptly, a ground for immediate termination under Section 13 of the Concession Agreement.

It does not appear from any of the pleadings filed in the adversary proceeding or in the Chapter 11 case that the Debtor took any steps to contest the termination in a New York State court, or that the Debtor contends that the termination was not effective in accordance with the terms of the

---

1. Section 548(a) provides that:

The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

(1) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or

(2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(B)(i) was insolvent on the date such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or

(iii) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

2. Section 276 provides, "Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors."

Concession Agreement or New York State law.

The Debtor does, however, in its complaint allege that: (1) the termination by RCB was in bad faith; (2) the Debtor's rights in the Concession Agreement were worth $200,000 at the time of the termination; (3) after the November 24, 1992 termination, but before the Debtor filed its petition and the 1993 baseball season commenced, the Debtor received offers to purchase its rights in the Concession Agreement for $200,000 from offerors who were ready, willing and able to perform the Concession Agreement for the 1993 baseball season and thereafter; (4) the termination and reversion back to RCB of the Debtor's rights under the Concession Agreement constituted a transfer within the meaning of the Bankruptcy Code and Article 10 of the New York Debtor and Creditor Law; and (5) the resulting transfer was constructively and intentionally fraudulent because: (a) the transfer occurred while the Debtor was insolvent; (b) RCB paid absolutely no consideration to the Debtor for the transfer; (c) the termination and transfer occurred within one year before the date of the filing of the Debtor's petition; (d) creditors of the Debtor in existence at the time of termination and resulting transfer remained unpaid; and (e) RCB's termination of the Concession Agreement and refusal to allow the Debtor to sell its interest in the contract after its termination were done with the specific intent of injuring, hindering, delaying and defrauding Debtor's suppliers.

On April 28, 1993, RCB filed a motion to dismiss the adversary proceeding pursuant to Rule 7012(b) on the basis that the Debt-or's complaint fails to state a cause of action upon which relief can be granted.

## DISCUSSION

A motion to dismiss a complaint for failure to state a claim upon which relief can be granted under Rule 12(b)(6) of the Federal Rules of Civil Procedure, as made applicable under Bankruptcy Rule 7012, must be granted when it appears with certainty that there is no set of facts that could be proven at trial which would entitle the plaintiff to any relief. *In re Rudaw/Empirical Software Products Ltd.*, 83 B.R. 241, 245 (Bankr.S.D.N.Y. 1988). On a motion to dismiss, the allegations must be taken as true and the complaint construed in a light most favorable to the plaintiff. *In re Nantz*, 44 B.R. 543, 545 (Bankr.N.D.Ill.1984); *Mathers Fund, Inc. v. Colwell Co.*, 564 F.2d 780, 783 (7th Cir.1977). Therefore, this Court will take as true all of the facts alleged in the Debtor's complaint for the purpose of deciding the motion to dismiss.

A substantial portion of each of the memorandums of law filed by the parties in connection with the RCB motion to dismiss is devoted to the issue of whether the termination of an executory contract in general and the Concession Agreement in this case constitutes a transfer as defined by Section 101(54).[3] It is clear that in defining "transfer" as it did in Section 101(54), Congress intended to make it as broad as possible. *See* H.R.Rep. No. 595, 95th Cong., 1st Sess. 314 (1977). Given the definition and the underlying intent of Congress, the termination of the Concession Agreement must be found to constitute a transfer within the meaning of Sections 101(54) and 548 of the Bankruptcy Code.[4]

---

**3.** Section 101(54) provides that, "'transfer' means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property, including retention of title as a security interest and foreclosure of the debtor's equity of redemption."

**4.** However, under the New York Debtor and Creditor Law, which incorporates the Uniform Fraudulent Conveyance Act, the term "conveyance" is not as broadly defined as in the Bankruptcy Code and does not include involuntary transactions. Section 270 defines "conveyance" as including "every payment of money, assignment, release, transfer, lease, mortgage or pledge of tangible or intangible property, and also the creation of any lien or incumbrance." Therefore, under the New York Debtor and Creditor Law, the non-collusive termination of an executory contract involuntarily in accordance with its terms and by reason of a debtor's material defaults is by definition not a fraudulent conveyance.

Beyond the issue of "transfer," the parties have extensively briefed and argued the few existing cases in this area [5] and the issues of: (1) whether the Debtor's interest in the Concession Agreement at the time of termination had any realizable value; (2) what the underlying policies of the fraudulent conveyance laws are; (3) what the underlying policies of the Bankruptcy Code's avoidance sections are, including the policy under Section 547 of promoting the equality of distribution to creditors; (4) whether a voiding of a prepetition involuntary and proper termination of a lease or other executory contract as a fraudulent transfer would be inconsistent with the holding of most bankruptcy courts that such a lease or contract so terminated does not constitute property of the estate; and (5) whether other related facts and circumstances surrounding the termination of the Concession Agreement affect the determination of whether it was a fraudulent transfer.

Rather than discussing each of these various issues and elements of the applicable statutes, the Court believes it is important to step back from the application of the literal provisions of Section 548(a) of the Bankruptcy Code and Section 276 of the New York Debtor and Creditor Law to the facts alleged in the Complaint to take a broad and realistic view of the case at hand.

This case presents a prepetition termination of an executory contract in accordance with the terms and conditions of the contract due to the material defaults of the Debtor. There are no allegations that this involuntary termination was in whole or in part the result of any collusion between any individuals or entities in any way associated with both of the respective parties designed to bring about a financial benefit to themselves or related entities to the prejudice of the Debtor's estate or its creditors. Although the involuntary termination of the Concession Agreement may constitute a technical "transfer" of the Debtor's interest in the Agreement within the meaning of Section 101(54) and Section 548(a) of the Bankruptcy Code and even if it were a conveyance under the New York Debtor and Creditor Law such a prepetition, ordinary course of commercial business, non-collusive termination of an executory contract in accordance with the terms of the contract by reason of a Debtor's material defaults is, as a matter of law, not a transaction or transfer which is actually or constructively fraudulent within the meaning, intent and underlying policy of these fraudulent conveyance laws.[6] This is so even if the Debtor's interest in the Concession Agreement may have had a realizable value at the time of termination which exceeded the amount necessary to cure all

---

**5.** *Matter of Wey,* 854 F.2d 196 (7th Cir.1988) (forfeiture of downpayment); *Matter of Commodity Merchants, Inc.,* 538 F.2d 1260 (7th Cir. 1976) (contract termination); *In re Veretto,* 131 B.R. 732 (Bankr.D.N.M.1991) (termination of real estate contract); *In re Indri,* 126 B.R. 443 (Bankr.D.N.J.1991) (lease termination); *In re Pinto,* 89 B.R. 486 (Bankr.E.D.Pa.1988) (lease termination); *In re Edward Harvey Co., Inc.,* 68 B.R. 851 (Bankr.D.Mass.1987) (lease termination); *In re Sheppard's Dental Centers, Inc.,* 65 B.R. 274 (Bankr.S.D.Fla.1986) (termination of management agreement); *In re Queen City Grain,* 51 B.R. 722 (Bankr.S.D.Ohio 1985) (lease termination); *In re Fashion World,* 44 B.R. 754 (Bankr.D.Mass.1984) (lease termination); *In re Jermoo's, Inc.,* 38 B.R. 197 (Bankr.W.D.Wis. 1984) (franchise contract termination).

**6.** Another bankruptcy court has come to the same conclusion that the termination of an executory contract is not a fraudulent transfer but found this on the basis that it did not fit into the

definition of "transfer." *In re Jermoo's, Inc.,* 38 B.R. 197, 206 (Bankr.W.D.Wis.1984). The Bankruptcy Court in *Jermoo's* noted that only 2 reported decisions understood that the termination of an executory contract was within the meaning of "transfer" but said "Since it is reasonable to assume that a great many executory contracts were terminated against insolvent debtors prior to bankruptcy filings, the nearly total silence of the courts strongly suggests a continuing practical construction of the fraudulent transfer statute by the bench and bar which excludes from the statute rightful terminations of operating agreements." *Id.* at 203–204. Although this Court does believe the termination of an executory contract to be a transfer within the meaning of Section 548, just like the *Jermoo's* court, this Court does not believe a rightful non-collusive termination by reason of a debtor's material defaults to be a fraudulent transfer.

of the Debtor's defaults under the Agreement.

■ The fraudulent conveyance statutes are intended to prevent an insolvent or undercapitalized debtor's estate and its creditors from being wrongfully deprived of assets which could be otherwise utilized for the payment of creditors. They are not intended to insure that creditors will never be deprived of a valuable asset. The deprivations these statues are designed and intended to prevent are those that are the result of an intentional fraud or a constructive fraud resulting from a wrongful or unwarranted participation on the part of the Debtor, whether by omission or commission.

Therefore, not every prepetition transaction or occurrence which may technically be a transfer under Section 101(54) and which results in a debtor being deprived of an asset while it is insolvent or undercapitalized and for which it receives no consideration or less than a fair consideration is necessarily avoidable as a fraudulent transfer. This is so notwithstanding the motivation of any parties to the transaction or occurrence other than the Debtor or parties in some way associated or in collusion with the Debtor.

In its introduction to the law of fraudulent conveyances, American Jurisprudence states,

A fraudulent conveyance, or, more correctly, a conveyance in fraud of creditors, may generally be defined as a transaction by means of which the owner of real or personal property has sought to place the land or goods beyond the reach of his creditors, or which operates to the prejudice of their legal or equitable rights, or a conveyance which operates to the prejudice of the legal or equitable rights of other persons, including subsequent purchasers.

37 Am.Jur.2d *Fraudulent Conveyances* § 1 (1968).

■ In the case at hand, the involuntary, non-collusive, ordinary course of commercial business prepetition termination of the Concession Agreement by RCB in accordance with the terms of the Concession Agreement, because of the material defaults of the Debtor, did not operate to the prejudice of the legal or equitable rights of the Debtor's creditors. Because of the material defaults of the Debtor at the time of termination, the Debtor's creditors did not have any legal or equitable rights in the Concession Agreement superior to the rights of RCB to terminate the Concession Agreement in accordance with its terms, whether or not the Debtor's rights under the Agreement had any actual realizable value over and above the amounts due by reason of the Debtor's defaults.

■ As to the Debtor's allegation that the termination, and thus the transfer, was made by RCB with the actual intent to hinder, delay or defraud creditors, Section 548(a)(1) of the Bankruptcy Code and Section 276 of the New York Debtor and Creditor Law by applicable case law require that the intent to hinder, delay or defraud creditors be on the part of the Debtor. In this case, there is no allegation or showing that the Debtor in any way caused the Concession Agreement to be involuntarily terminated by RCB with the intent to hinder, delay or defraud its own creditors. As to the Debtor's allegation that the termination, and thus the transfer, was made by RCB in bad faith, the non-collusive bad faith of RCB, even if proved, is not relevant to the basic determination of whether the termination was an avoidable fraudulent transfer.

Because a particular set of facts may appear to fall within the literal provisions of an avoidance statute does not mean that there must be a finding of avoidance when that result, as here, would clearly not meet the underlying purpose and policy of the statute.

It cannot go unsaid that the commercial ramifications of reading Section 548 too literally so as to allow it to be used to avoid a prepetition, ordinary course of commercial business, non-collusive termination of an executory contract in accordance with its terms when the Debtor has materially

defaulted under the contract would be devastating.

## CONCLUSION

Based on the foregoing, the motion of RCB to dismiss the Debtor's adversary proceeding is granted.

**IT IS SO ORDERED.**